**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ZHIQIANG HU,

*Petitioner,*

v.

ERIC H. HOLDER JR., Attorney
General,

*Respondent.*

No. 09-70240

Agency No.
A099-736-933

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
May 5, 2011—Pasadena, California

Filed July 14, 2011

Before: Harry Pregerson, Raymond C. Fisher, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Pregerson

**COUNSEL**

Peter Afrasiabi (argued), One LLP, Newport Beach, California, and Kathryn Marie Davis, Pasadena, California, for the petitioner.

David H. Wetmore (argued), U.S. Department of Justice Office of Immigration Litigation, Washington, D.C., and Channah Farber, U.S. Department of Justice, Civil Division, Washington, DC., for the respondent.

## OPINION

PREGERSON, Circuit Judge:

Zhiqiang Hu, a native and citizen of China, petitions for review of a final order of removal by the Board of Immigration Appeals ("BIA"). The BIA denied Hu's applications for asylum and withholding of removal because it concluded that Hu had failed to establish that his past mistreatment was on account of a protected ground. The BIA also denied Hu's application for protection under the Convention Against Torture ("CAT"). We have jurisdiction under 8 U.S.C. § 1252. We grant the petition for review and remand to the agency for further proceedings consistent with this opinion.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background[1]

Zhiqiang Hu is a fifty-one year old native and citizen of China. He testified at his hearing before the Immigration Judge ("IJ") that he had been a machinery mechanic for a "mid size nationally owned" factory and that he had worked at this government-owned factory since December 1979. In the affidavit Hu submitted in support of his asylum applica-

---

[1]Hu testified consistently to the facts that follow. Because the BIA did not make an explicit adverse credibility finding, we assume that the facts in Hu's testimony and asylum application are true. *See Ernesto Navas v. INS*, 217 F.3d 646, 652 n.3 (9th Cir. 2000) ("Where the BIA does not make an explicit adverse credibility finding, we must assume that the applicant's factual contentions are true.").

tion, he stated that the government-owned factory was very successful, "[h]owever, good profit and sufficient funds encouraged corruption of the factory leadership." Hu further stated that "factory officials often enjoyed themselves with eating, drinking and giving gifts to their business connections at public expense[.]" Hu explained that the factory leadership "spent public funds on traveling, sightseeing and took factory property as their own property." Hu believed that the "factory was heavily in debt" because of these corrupt activities.

On March 5, 2004, Hu and approximately 500 other workers were laid off from their jobs at the government-owned factory and the factory was shut down. The workers were told that the factory was "deeply in debt" and could not pay their salaries. The laid-off workers were promised "supplemental pay" of 6,000 yuan[2] and an additional monthly salary depending on each employee's work history.

Hu testified that these "promise[s] were not kept." Hu and two other factory leaders, acting as representatives of the factory workers, "wrote [two] complaint letters to the [government agency in charge of the factory] to request proper arrangement for the laid-off workers." Initially, they did not receive a response from the agency, but after further inquiry, were told to "wait."

Faced with "life pressure[s,]" and believing they had no other options, Hu and the other two worker representatives organized a group of "more than 100 laid off workers to protest in front of the city government building." Hu testified that the protestors did not obtain a permit for the demonstration because he believed "the government will not issue it." Hu testified that on September 3, 2004, he arrived at the government building with the other organizers and laid-off workers

---

[2]On April 21, 2011, 6,000 Chinese Yuan, also known as "RMB," equaled approximately $921.00. *See* XE Currency Calculator, http://www.xe.com/ucc/.

at about 8:30 a.m., but the front door was "closed tightly." The laid-off workers "wanted to go into the city government to explain [their] situation," but the guard would not allow them to enter. The government employees in the building "did not come out to see [the protestors] and they did not allow [the protestors] to go in[side]." Thus, the group "sat quietly in front of the front gate."

Hu testified that he believed a guard "called the police, telling them that [the protestors] are here to cause trouble." At about 11 a.m., four police vehicles arrived at the city building and, with "police batons in their hands[, the police] rushed through the crowd of workers . . . and beat the crowd." Hu and the other two worker representatives tried to reason with the police, but the police would not talk to them. Instead, the police handcuffed them, pushed them into police cars, and took them to the police station, where they were held separately and not given any food or water.

The morning after his arrest, Hu was taken in for an interrogation. The police "accuse[d] [Hu] of gathering a crowd to cause trouble and disturb the order of the society. Acting against the government and against the [Communist] party." The police tried to get Hu to confess to these accusations, but he refused. Hu told the police that he was "not against the government and [ ] did not disturb the order of society. [He was] just [in favor of] the legal rights of those laid off workers." A police officer grabbed Hu, punched and kicked him, and slapped him in the face. Another police officer beat Hu with a baton.

Hu was placed in a cell with six other people. He testified that the room was locked, had no light, and had only a small window about one square foot in size. Hu was detained there for an additional ten days. He was given porridge and pickles to eat, and was only allowed to leave the cell "in the morning for personal hygiene."

Hu was released after his family and friends paid "a guarantee money" of 3,000 RMB.[3] As a condition of his release, Hu was required to report every Tuesday to the police station, and was placed under the supervision of the neighborhood committees. Hu stated in his affidavit that if he violated these rules, he "would be arrested again."

Hu diligently reported weekly to the police. He stated in his affidavit that he "was living in terror everyday [because he] was afraid that [he] may be arrested again one day." A friend suggested Hu flee the country. Hu decided to go to the United States and his friend's friend "handled all matters related to the visa," including filling out Hu's visa application. On Hu's visa application, this friend's friend stated that the reason for Hu's travel to the United States was business-related and that he would be traveling with a colleague. At Hu's consular interview, Hu told U.S. officials that he was traveling to the United States for business purposes. Hu testified before the IJ that the information in the visa application regarding his education, employment history, and current employment was false, and that he did not indicate on the visa form that he had been arrested because he believed the Chinese government would not allow him to leave the country if he did so.

On April 24, 2005, Hu arrived in the United States on a visa that was valid until July 23, 2005. Hu's wife remained in China with their son, who at the time was very ill with a blood vessel tumor. Hu's wife informed him that the police visited their house every ten to fourteen days looking for Hu. His wife also told Hu, "no matter what[,] you cannot come back, they have already [told] us that your charges [have] been changed. Now you are being charged for betraying your country. If you come back, you will surely die." Hu testified that he is afraid that he would be persecuted if he is forced to return to China "[b]ecause [he] was trying to seek the legal

---

[3]On April 21, 2011, 3,000 RMB equaled approximately $461.00. *See* XE Currency Calculator, http://www.xe.com/ucc/.

benefit of all the laid off workers and [their] laid off salary pay." Hu explained that he is afraid that he would be arrested again and "give[n] even more harsh punishment."

## B.   The IJ and BIA Decisions

Without citing a single case, the IJ denied Hu's applications for asylum, withholding of removal, and protection under the CAT. The IJ concluded that Hu was not credible because his visa application "states that he worked as a manager for a company," but Hu testified that "he had been laid off from his employment." The IJ also concluded that Hu had failed to establish that he had suffered persecution on account of any of the protected grounds. The entirety of the IJ's reasoning is as follows:

> Assuming that the 9th Circuit standard for credibility holds that his statements in his declaration are consistent, the respondent was involved in a protest outside a government office for which he did not have authorization. The respondent protested being laid off. However, there is no right to employment or he has not shown that the fact that the factory was closed and that 500 employees were laid off was in any way on account of any of the protected grounds. It was an economic, at best, decision but there is no evidence that this was, in any way, related to a protected ground. Therefore, the respondent has failed to establish a nexus between the laying off. As to whether or not the respondent's protest is protected, the Court finds that it was not and that there is no evidence that [Hu] was participating in any conduct which is protected by the asylum laws. His protest seems to have been an illegal gathering for which he was arrested for disturbing the peace. Therefore, he has not established a nexus with that conduct either. Having failed to establish a nexus for asylum, he has also failed to establish a nexus for withholding.

Finally, the IJ concluded that Hu had not established a clear probability that he would be tortured and thus also denied Hu protection under the CAT.

The BIA did not explicitly affirm the IJ's adverse credibility finding, but "agree[d] with the [IJ's] determination that the respondent had not established a nexus to a protected ground." The BIA explained that "[e]ven if credible, it appears that respondent's mistreatment arose solely because of a private dispute which does not qualify him for relief." The BIA also rejected Hu's claim that he was expressing a political opinion because he was a whistle-blower.

According to the BIA, Hu was not expressing a political opinion during his protest "because he was seeking redress for a private employment matter." Since Hu failed to establish his eligibility for asylum, the BIA reasoned that he had failed to satisfy the higher standard required for withholding of removal. Finally, the BIA concluded that Hu had failed to establish that he would likely be tortured by or with the acquiescence of a government official, and therefore denied Hu protection under the CAT.

## II. STANDARD AND SCOPE OF REVIEW

We review for substantial evidence the BIA's decision that an applicant has not established eligibility for asylum, withholding of removal, and CAT protection. *See Ahmed v. Keisler*, 504 F.3d 1183, 1191 (9th Cir. 2007); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). We must uphold the BIA's factual findings if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Elias-Zacarias*, 502 U.S. at 481 (internal quotation marks omitted). Legal questions are reviewed de novo. *See Castillo-Perez v. INS*, 212 F.3d 518, 523 (9th Cir. 2000).

Our "[r]eview is limited to the BIA's decision, except to the extent the IJ's opinion is expressly adopted." *Hosseini v.*

*Gonzales*, 471 F.3d 953, 957 (9th Cir. 2006) (internal quotation marks omitted). "[T]his court cannot affirm the BIA on a ground upon which it did not rely." *Doissaint v. Mukasey*, 538 F.3d 1167, 1170 (9th Cir. 2008) (citing *Ernesto Navas v. INS*, 217 F.3d 646, 658 n.16 (9th Cir. 2000)).

The BIA's decision is silent on the issue of credibility, despite the IJ's explicit adverse credibility finding, so we may assume that the BIA found Hu to be credible. *Krotova v. Gonzales*, 416 F.3d 1080, 1084 (9th Cir. 2005).[4] We therefore rely on Hu's testimony and review the determination that Hu has not demonstrated a nexus to a protected ground for substantial evidence.

## III.   DISCUSSION

To be eligible for a discretionary grant of asylum, Hu must prove that he is a refugee; namely, that he is an alien who is "unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, [his] country [of nationality] because of persecution or a well-founded fear of

---

[4]The government concedes that the BIA did not affirm the IJ's adverse credibility finding and that we are to presume Hu credible. "We take the government's case as it is presented to us." *Mamouzian v. Ashcroft*, 390 F.3d 1129, 1133 n.2 (9th Cir. 2004).

The presumption of truth and the government's concession are particularly reasonable here, where the IJ's adverse credibility finding is not supported by substantial evidence. The IJ erroneously concluded that inconsistencies between Hu's testimony before the IJ and information in his U.S. visa application were material omissions supporting an adverse credibility finding. *See Akinmade v. INS*, 196 F.3d 951, 956 (9th Cir. 1999) (distinguishing between "false statements made to establish the critical elements of the asylum claim from false statements made to evade INS officials"); *Kaur v. Ashcroft*, 379 F.3d 876, 889 (9th Cir. 2004) ("[T]he fact that an asylum seeker has lied to immigration officers or used false passports to enter this or another country, without more, is not a proper basis for finding her not credible."), *superseded by statute on other grounds*, REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, *as recognized in Singh v. Holder*, 602 F.3d 982, 986-87 (9th Cir. 2010).

persecution on account of race, religion, nationality, member-ship in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

To establish eligibility for asylum based on past persecu-tion, Hu must show:

> (1) an incident, or incidents, that rise to the level of persecution; (2) that is 'on account of' one of the statutorily-protected grounds; and (3) is committed by the government or forces the government is either 'unable or unwilling' to control.

*Mengstu v. Holder*, 560 F.3d 1055, 1058 (9th Cir. 2009) (quoting *Ernesto Navas*, 217 F.3d at 655-56).

The only element at issue in this case is whether Hu was harmed "on account of" a protected ground. "To demonstrate a nexus between the harm [Hu] suffered and his political opinion, [Hu] must show (1) that he held, or his persecutors believed that he held, a political opinion; and (2) that he was harmed because of that political opinion." *Baghdasaryan v. Holder*, 592 F.3d 1018, 1023 (9th Cir. 2010) (citing *Ernesto Navas*, 217 F.3d at 656). A political opinion encompasses more than just participation in electoral politics or holding a formal political ideology. *See Ahmed*, 504 F.3d at 1192. "A political opinion can be an actual opinion held by the appli-cant, or an opinion imputed to him or her by the persecutor." *Id.* Under the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231, 302 (2005), Hu must show that his actual political opinion or a political opinion his persecutors imputed to him "was at least one central reason" for his mistreatment.[5]

---

[5]The REAL ID Act applies to Hu's case because he filed his application for asylum after May 11, 2005, the effective date of the REAL ID Act. *Cf. Sinha v. Holder*, 564 F.3d 1015, 1021 n.3 (9th Cir. 2009) (applying pre-REAL ID Act standards because petitioner's asylum application was filed before May 11, 2005).

8 U.S.C. § 1158(b)(1)(B)(I); *see also Parussimova v. Mukasey*, 555 F.3d 734, 740-41 (9th Cir. 2009). "[A] motive is a 'central reason' if the persecutor would not have harmed the applicant if such motive did not exist." *Parussimova*, 555 F.3d at 741. There may be more than one central reason, and an asylum applicant is not required to prove which reason is dominant. *See id.*

Hu can establish the motivation of his alleged persecutors by direct or circumstantial evidence. *See Elias-Zacarias*, 502 U.S. at 483. Hu has offered evidence that Chinese police officials mistreated him after they accused him of "gathering a crowd to cause trouble and disturb the order of the society" and "[a]cting against the government and against the [Communist] party." And notably the abuse persisted after he told them that he was "not against the government" but was merely in favor of "the legal rights of those laid off workers." It is not entirely clear if the police were motivated by the anti-government political opinion they imputed to Hu, or by Hu's pro-labor position. Either motivation, however, satisfies the nexus requirement because, under these facts, Hu's pro-labor position constituted a protected political opinion.

### A.   Chinese officials imputed an anti-government political opinion to Hu

**[1]** An imputed political opinion is a valid basis for relief. *Canas-Segovia v. INS*, 970 F.2d 599, 601 (9th Cir. 1992). "[W]e have repeatedly held that an applicant can establish imputed political opinion based upon the persecutor's erroneous belief as to the applicant's political affiliation or opinion." *Kumar v. Gonzales*, 444 F.3d 1043, 1054 (9th Cir. 2006). When an asylum applicant argues he was persecuted because of an imputed political opinion, the focus shifts "from the views of the victim to the views of the persecutor." *Sangha v. INS*, 103 F.3d 1482, 1489 (9th Cir. 1997).

**[2]** Regardless of whether Hu actually held an anti-government opinion, the record compels the conclusion that

the police imputed an anti-government political opinion to Hu. They said as much to him: Hu credibly testified repeatedly that the police accused him of "acting against the government and against the [Communist] party." *See Zhu v. Mukasey*, 537 F.3d 1034, 1045 (9th Cir. 2008) (concluding that petitioner suffered harm on account of an imputed political opinion, where the Chinese police arrested petitioner and accused her of being "against the government" after she sent a letter to the local town condemning the appointment of her rapist to a position of local political power); *Baghdasaryan*, 592 F.3d at 1024-25 (political opinion was imputed to petitioner where "top law enforcement official indicated that [petitioner] was detained and beaten because he was 'defaming' and 'raising his head' against" government corruption). The anti-government political opinion Chinese officials imputed to Hu is a protected ground under our asylum laws. *See id.*

## B. Hu's pro-labor activities constitute a political opinion

[3] Hu was also engaged in protected activity because he held and expressed a pro-labor political opinion. We have repeatedly recognized that labor speech in many instances can be political. *See, e.g.*, *Zavala-Bonilla v. INS*, 730 F.2d 562, 563 (9th Cir. 1984) (acknowledging the political nature of a textile worker's participation in her union's activities, including a nationwide strike); *Prasad v. INS*, 101 F.3d 614, 617 (9th Cir. 1996) (concluding that petitioner was persecuted because of his advocacy for the workplace rights of Fijians of Indian descent and his role as a delegate in the ousted Labour Party); *Agbuya v. INS*, 241 F.3d 1224, 1229 (9th Cir. 2001) (holding company executive was kidnaped based on imputed political opinion stemming from a labor dispute); *Vera-Valera v. INS*, 147 F.3d 1036, 1037-38 (9th Cir. 1998) (concluding that Marxist guerillas imputed a pro-government political opinion to labor leader's support of a construction project that would benefit the workers at the guerillas' expense).

Although there is no easy test to determine when a worker's or employer's action is political — as opposed to or in addition to economic — our case law makes clear that labor agitation advancing economic interests can nevertheless express a political opinion.

**[4]** Hu's engagement in labor speech is especially political because his employer *was* the government. Moreover, his dispute arose not from the normal course of business, but rather from official corruption and deception. Hu wrote letters to the government on behalf of the laid-off workers, led a protest against the government in front of a government building, and told Chinese officials that he was just in favor of "the legal rights of those laid off workers" *because* the government refused to pay promised severance benefits to Hu and his coworkers after failing to prevent the corruption that left them unemployed. *See also Mamouzian v. Ashcroft*, 390 F.3d 1129, 1133-35 & n.3 (9th Cir. 2004) (recognizing that petitioner was persecuted on account of her political opinion when she was arrested, detained, and beaten after expressing her opposition to the economic policies of the ruling party as implemented in the state-run factory where she worked). Accordingly, there is nothing in the record to support the BIA's conclusion that Hu's "mistreatment arose solely because of a private dispute."

## C.   Hu was engaged in protected activity

Despite the compelling evidence that Chinese officials imputed an anti-government political opinion to Hu and that he was engaged in pro-labor political activities, the IJ concluded that Hu's activities were not protected under the asylum laws because the "protest seems to have been an illegal gathering for which he was arrested for disturbing the peace." Contrary to the IJ's conclusion, the Chinese police officials who arrested Hu did not accuse him of illegally gathering without a permit. Rather, they accused him of "gathering a crowd to cause trouble and disturb the order of the society,"

and "[a]cting against the government and against the [Communist] party." Perhaps a gathering without a permit disturbs the order of society, but it is hardly an act against the ruling party unless it is construed as a political protest. Even though there might have been multiple motivations for the government's mistreatment of Hu, his credible testimony compels a finding that one of the central reasons for his alleged persecution was because of a protected ground — his expression of a political opinion, actual or imputed. *See Parussimova*, 555 F.3d at 741.

**[5]** China can legitimately require permits even for peaceful demonstrations — in America the First Amendment tolerates as much — but nothing in the record suggests that Hu's lack of a permit actually motivated the arrest and abuse. *See Yidong Bu v. Gonzales*, 490 F.3d 424, 429 (6th Cir. 2007) (concluding that petitioner was "detained not as a 'common criminal' for violating China's anti-strike laws, but as a political prisoner who was guilty of opposition to the government").[6] The absence of any legitimate criminal prosecution is circumstantial evidence suggesting the Chinese government was not legitimately punishing Hu for protesting without a permit or simply disturbing the peace. *See Ndom v. Ashcroft*, 384 F.3d 743, 755 (9th Cir. 2004) ("[P]ersecution in the absence of any legitimate criminal prosecution, conducted at least in part on account of political opinion, provides a proper basis for asylum and withholding of deportation . . . ."), *superseded in part*

---

[6]There may be situations in which an arrest for protesting without a permit is not a legitimate form of prosecution but a pretext for suppressing political dissent. As we stated in *Chanco v. INS*, "[w]hen a government does not respect the . . . right to peacefully protest, punishment by such a government for a politically motivated act may arguably not constitute a legitimate exercise of sovereign authority and may amount to persecution." 82 F.3d 298, 302 (9th Cir. 1996); *see also Bandari v. INS*, 227 F.3d 1160, 1168 (9th Cir. 2000) (holding that the government was not engaged in legitimate prosecution, where "the 'investigation' was aimed at stamping out political opposition to the government, even if it was under the guise of a lawful investigation").

*by statute as stated in Parussimova*, 555 F.3d at 739-40. Hu suffered an eleven-day detention, harsh interrogation, beatings by police officials, and the requirements after his release that he report to the police station weekly and endure the supervision of neighborhood committees, despite never being convicted of, or even charged with, a crime. Instead, Hu was accused of opposing the Communist Party. Accordingly, the IJ's conclusion that Hu was not engaged in protected activity because "[h]is protest seems to have been an illegal gathering for which he was arrested for disturbing the peace" is not supported by substantial evidence in the record.

## D. Hu has satisfied the nexus requirement

**[6]** In sum, the agency's reasons for denying Hu's applications for asylum and withholding of removal are clearly untenable. The BIA ignored the anti-government political opinion Chinese officials imputed to Hu as a motivating factor for their abuse, and erroneously concluded that Hu's pro-labor activities did not constitute an expression of a political opinion. Further, the IJ's conclusion that Chinese officials mistreated Hu because of legitimate prosecution is not supported by substantial evidence.

**[7]** The record compels the conclusion that Hu has satisfied the nexus requirement. Chinese officials mistreated Hu after accusing him of "[a]cting against the government and against the [Communist] party," and persisted even after he told them he was just in favor of "the legal rights of those laid off workers." This is clear evidence that Chinese officials mistreated Hu on account of a political opinion. *See Kebede v. Ashcroft*, 366 F.3d 808, 812 (9th Cir. 2004) (petitioner satisfied the nexus requirement where soldiers stated that rape was because of petitioner's family's position in prior Ethiopian regime); *Borja v. INS*, 175 F.3d 732, 736 (9th Cir. 2000) *(en banc)* (finding the nexus requirement satisfied where the petitioner had articulated her political opposition to the guerillas and they immediately got "mad" and pointed a gun at her),

*superseded by statute on other grounds as stated by Parussimova*, 555 F.3d at 739. Accordingly, we hold that any reasonable fact-finder would be compelled to conclude that the past mistreatment Hu suffered was on account of a protected ground.

### E.   Remand to the BIA

**[8]** We thus grant the petition for review and remand to the BIA for a determination whether Hu is eligible for asylum and withholding of removal. Hu argues that remand is not necessary because the BIA's conclusion that he failed to establish a nexus presupposes a finding of past persecution. But the nexus inquiry and the persecution inquiry are distinct, and neither the IJ nor the BIA reached the issue of whether the past mistreatment Hu suffered by Chinese officials constitutes past persecution, or whether Hu has a well-founded fear of future persecution. Under *INS v. Ventura*, when the BIA has not considered an issue, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." 537 U.S. 12, 16 (2002) (per curiam). Thus, we remand to the BIA to determine whether, in light of this opinion, Hu suffered past persecution or has a well-founded fear of future persecution.

**[9]** We also remand Hu's CAT claim to the BIA because we cannot conduct a meaningful review of the BIA's decision on this issue, where the BIA failed to provide a reasoned explanation of its decision. *See Movsisian v. Ashcroft*, 395 F.3d 1095, 1098 (9th Cir. 2005) ("We have long held that the BIA abuses its discretion when it fails to provide a reasoned explanation for its actions."). In his brief to the BIA, Hu's counsel "request[ed] the Board judicially notice" the State Department's 2004 Human Rights Practices Country Report for China and quoted significant portions of the report that show political dissidents suffer extreme punishment from government officials. Hu testified that he has now been charged with treason, so if the Chinese authorities do torture

dissidents then he may have a colorable CAT claim. The BIA did not indicate how it ruled on Hu's request for judicial notice or whether it considered the 2004 State Department Report when it denied Hu protection under the CAT. *See Sagaydak v. Gonzales*, 405 F.3d 1035, 1040 (9th Cir. 2005) ("[T]he BIA [is] not free to ignore arguments raised by a petitioner."). We therefore instruct the BIA on remand to provide a reasoned explanation for its decision on Hu's CAT claim.

## IV.   CONCLUSION

We grant the petition for review, and reverse the BIA's finding that Hu has not established a nexus to a protected ground. We remand to the BIA to determine whether Hu has established past persecution or a well-founded fear of future persecution, with instructions to provide a more reasoned explanation of its decision on Hu's CAT claim.

Petition **GRANTED; REMANDED** for further proceedings.